IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 26-403-1** |
| **MSC SHIPMANAGEMENT LIMITED** | **:** | |

# GUILTY PLEA AGREEMENT

Under Rule 11 of the Federal Rules of Criminal Procedure, the government, defendant MSC Shipmanagement Limited, and the defendant's counsel enter into the following guilty plea agreement. Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania and the Environmental Crimes Section of the United States Department of Justice.

1. The defendant agrees to plead guilty to Counts One and Two of an information, waiving prosecution by indictment, charging it with two violations of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1908(a), all arising from the defendant's knowing failure, through its agents and employees, to maintain an accurate Oil Record Book during the Motor Vessel ("M/V") MSC Samira III's port calls in Philadelphia, Pennsylvania, on January 9, 2025, and January 27, 2025. The defendant further acknowledges its waiver of rights, as set forth in the attachment to this agreement.

2. This agreement is conditioned upon the following: (a) defendant Hong Kong Spirit Shipping & Trading Limited entering a guilty plea in this case; and (b) acceptance of that plea by a United States District Judge at the time of the guilty plea hearing. If defendant Hong Kong Spirit Shipping & Trading Limited does not satisfy these two conditions, or subsequently

seeks to withdraw its guilty plea, the government, in its sole discretion, will be released from all its obligations under this agreement. In addition, if defendant Hong Kong Spirit Shipping & Trading Limited breaches its plea agreement, the government, in its sole discretion, may void this defendant's plea agreement.

3. In the event that (a) the defendant's conviction is later vacated for any reason; (b) the conviction of defendant Hong Kong Spirit Shipping and Trading Limited is later vacated for any reason; (c) the defendant violates this agreement; (d) defendant Hong Kong Spirit Shipping and Trading Limited violates its plea agreement; (e) the defendant's plea is later withdrawn; or (f) defendant Hong Kong Spirit Shipping and Trading Limited's plea is later withdrawn, the defendant waives all defenses based on speedy trial and the statute of limitations, for 120 days from any of these events.

4. The defendant understands, agrees, and has had explained to it by counsel that the following statutory maximum sentences apply in this case: For Counts One and Two, charging violations of APPS: five years of probation, with a minimum of one year of probation; a fine of $500,000 per count, or twice the gross pecuniary gain or loss resulting from the unlawful conduct; and a $400 special assessment per count. The total permissible statutory maximum sentence is five years of probation; a fine of $1,000,000, or twice the gross pecuniary gain or loss resulting from the unlawful conduct; and a special assessment of $800. Full restitution may also be ordered.

5. The parties agree that this plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and that the following specific sentence is the appropriate disposition of this case: four years of probation, a fine of $875,000, and a special assessment of

$800. The defendant agrees that during any term of probation imposed at sentencing, the conditions of probation should include the following special conditions:

a. The defendant shall commit no further violations of the International Convention for the Prevention of Pollution from Ships, as amended ("MARPOL"), federal, state, or local law, and, when operating within the jurisdiction of the United States, shall conduct all its operations in accordance with the laws of the United States. If the defendant learns of any such violations committed by its agents or employees during the term of probation, the defendant shall notify the United States of the violations in accordance with the terms of the Environmental Compliance Plan ("ECP"), attached hereto as Exhibit A.

b. The defendant agrees to develop, adopt, establish, implement, and fund the environmental remedial measures set forth in the ECP during its term of probation, consistent with sentencing policies set forth in U.S.S.G. § 8D1.4. As set forth in Exhibit A, defendant has agreed to retain the services of an outside independent Third Party Auditor to perform external audits and to perform the duties set forth in the ECP and to report to the Court and the United States Probation Office.

If the Court does not accept this plea agreement, then either the defendant or the government will have the right to withdraw from the plea agreement and the defendant will have the right to withdraw the guilty plea.

6. The government may:

a. Recommend a sentence consistent with paragraph 5 above.

b. Comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing including evidence relating to dismissed counts, if any, and to the character and any criminal conduct of the defendant; address the Court

regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant at sentencing.

c. Nothing in this agreement shall limit the government in its comments in, and responses to, any post-sentencing matters.

7. The defendant agrees to pay a fine of $875,000. The United States is not aware of any identifiable victims and is therefore not seeking an order of restitution in this case. The defendant agrees that any restitution or fine imposed by the Court shall be due and payable immediately and on such terms and conditions that the Court may impose. In the event the Court imposes a schedule for the payment of restitution or fine, the defendant understands and agrees that such a schedule represents a minimum payment obligation and does not preclude the government from pursuing any other means by which to satisfy the defendant's full and immediately enforceable financial obligation under applicable federal and/or state law.

8. The defendant agrees that forfeiture, restitution, fine, assessment, tax, interest, or other payments in this case do not constitute extraordinary acceptance of responsibility or provide any basis to seek a variance from the applicable Sentencing Guideline range.

9. The defendant agrees to pay the special victims/witness assessment in the amount of $800 on the date of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

10. Except as otherwise outlined in this agreement, the defendant may not withdraw its plea because the Court declines to follow any recommendation, motion, or stipulation by the parties to this agreement. Except as otherwise outlined in this agreement, no one has promised or guaranteed to the defendant what sentence the Court will impose.

11. The parties agree to jointly move the Court to forgo preparation of a Presentence Investigation Report (PSR) and consent to proceeding to sentencing without a PSR.

12. If the defendant commits any federal, state, or local crime between the date of this agreement and its sentencing, or otherwise violates any other provision of this agreement, the government may declare a breach of the agreement, and may at its option: (a) prosecute the defendant for any federal crime including, but not limited to, perjury, obstruction of justice, and the substantive offenses arising from this investigation, based on and using any information provided by the defendant during the investigation and prosecution of the criminal case; (b) upon government motion, reinstate and try the defendant on any counts which were to be, or which had been, dismissed on the basis of this agreement; (c) be relieved of any obligations under this agreement regarding recommendations as to sentence; and (d) be relieved of any stipulations under the Sentencing Guidelines. Moreover, the defendant's previously entered guilty plea will stand and cannot be withdrawn by it. The decision shall be in the sole discretion of the government both whether to declare a breach, and regarding the remedy or remedies to seek. The defendant understands and agrees that the fact that the government has not asserted a breach of this agreement or enforced a remedy under this agreement will not bar the government from raising that breach or enforcing a remedy at a later time.

13. If the Court accepts the plea agreement and imposes the sentence stated in paragraph 5 of this agreement, the government agrees that it will not file any appeal of the sentence in this case, and the defendant agrees that it will not file any appeal, any collateral attack, or any other writ or motion that challenges the defendant's conviction, sentence, or any other matter relating to this prosecution, including any assessment, forfeiture, restitution, or the length or condition of supervised release, whether such an appeal, collateral attack, or other writ

or motion arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law. As part of this knowing and voluntary waiver of the right to challenge the conviction and sentence, the defendant expressly waives the right to raise on appeal or on collateral review any argument that (1) the statute to which the defendant is pleading guilty is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute. However, the defendant retains the right to file a claim, if otherwise allowed by law, that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance.

14. If the Court does not accept the plea agreement and neither party withdraws from the plea agreement, and the defendant enters and maintains a guilty plea, then the parties agree to continue to recommend the sentence stated in paragraph 5, and the defendant voluntarily and expressly waives all rights to file any appeal, any collateral attack, or any other writ or motion that challenges the defendant's conviction, sentence, or any other matter relating to this prosecution, including any assessment, forfeiture, restitution, or the length or condition of supervised release, whether such an appeal, collateral attack, or other writ or motion arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law. As part of this knowing and voluntary waiver of the right to challenge the conviction and sentence, the defendant expressly waives the right to raise on appeal or on collateral review any argument that (1) the statute to which the defendant is pleading guilty is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute.

a. Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of its sentence.

b. If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal or petition for collateral relief but may raise only a claim, if otherwise permitted by law in such a proceeding:

i. that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 4 above;

ii. challenging a decision by the sentencing judge to impose an "upward variance" above the final Sentencing Guideline range determined by the Court; and

iii. that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance of counsel.

If the defendant does appeal or seek collateral relief pursuant to this subparagraph (b), no issue may be presented by the defendant in such a proceeding other than those described in this subparagraph (b).

15. The defendant acknowledges that pursuing an appeal or any collateral attack waived in either of the two preceding paragraphs may constitute a breach of this plea agreement. The government recognizes that the mere filing of a notice of appeal is not a breach of the plea agreement. The government may declare a breach only after the defendant or his counsel thereafter states, either orally or in writing, a determination to proceed with an appeal or collateral attack raising an issue the government deems barred by the waiver. The parties acknowledge that the pursuit of an appeal constitutes a breach only if a court determines that the appeal does not present an issue that a judge may reasonably conclude is permitted by an

exception to the waiver stated in the preceding paragraph or constitutes a “miscarriage of justice” as that term is defined in applicable law.

16. The defendant understands that if the Court accepts the recommendation of the parties and imposes the sentence stated in paragraph 5 of this agreement, the government will affirmatively notify the United States Coast Guard when judgment is entered and sentencing is complete in all related cases, in compliance with Paragraph 3(e) of the Agreement on Security dated February 7, 2025.

17. The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney’s fees and other litigation expenses arising out of the investigation or prosecution of this matter.

18. The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

19. The defendant is satisfied with the legal representation provided by the defendant’s lawyer; the defendant and this lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that it is guilty.

20. The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and of a responsible corporate officer. The defendant shall provide to the government for attachment to this plea agreement a resolution of the defendant’s Board of Directors authorizing the corporation to enter a plea of guilty and authorizing that responsible corporate officer to execute this agreement.

21. This plea agreement shall bind the defendant and its successors and assigns and parent corporations. The defendant or its successors-in-interest, if applicable, shall provide each undersigned prosecuting office and the United States Probation Office for the Eastern District of Pennsylvania with immediate notice of any name change, corporate reorganization, sale or purchase of vessels subject to the ECP, signing or termination of ship management contracts, or similar action affecting this plea agreement and the ECP, pursuant to the notification provisions set forth in the ECP. No change in name, change in corporate or individual control, corporate reorganization, change in ownership, merger, change of legal status, sale or purchase of vessels, or similar action shall alter the defendant's responsibilities under this plea agreement. The defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this plea agreement.

22. The defendant agrees not to take any position, or cause another to take any position, or ask another to submit a position as an amicus curie, on any government motion that may be filed for payment of fine money, pursuant to 33 U.S.C. § 1908(a), to the person(s) who provided information leading to the imposition of the criminal penalties in this case.

23. The parties have also entered a supplemental agreement that is filed under seal. It is agreed that the parties' guilty plea agreement, along with the sealed supplement, presents the entire agreement of the parties with regard to the defendant's guilty plea and sentence. The parties agree that neither has made any additional promise, agreement, or understanding other than those set forth in this written guilty plea agreement and the sealed supplement, and that no additional promises, agreements, or understandings will be entered into unless in writing and signed by all parties.

DAVID METCALF
United States Attorney

_Salvatore L. Astolfi_

SALVATORE L. ASTOLFI
Chief, Criminal Division
Assistant United States Attorney

MSC SHIPMANAGEMENT LIMITED
Principal Corporate Officer of Defendant

TANNER HONEA
Counsel for Defendant MSC Shipmanagement Limited

*s/ Angella N. Middleton*

ANGELLA N. MIDDLETON Assistant United States Attorney

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division

*s/ Lauren D. Steele*

LAUREN D. STEELE
Trial Attorney

Date: August 26, 2026

**Attachment**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 26-403** |
| **MSC SHIPMANAGEMENT LIMITED** | : | |

## ACKNOWLEDGMENT OF RIGHTS

I hereby acknowledge, on behalf of the defendant, that the defendant has certain rights that it will be giving up by pleading guilty.

1. I understand that the defendant does not have to plead guilty.

2. The defendant may plead not guilty and insist upon a trial.

3. At that trial, I understand

a. that the defendant would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with its attorney, it would have the right to participate in the selection of that jury;

b. that the jury could only convict the defendant if all 12 jurors agreed that they were convinced of its guilt beyond a reasonable doubt;

c. that the government would have the burden of proving the defendant's guilt beyond a reasonable doubt and that the defendant would not have to prove anything;

d. that the defendant would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that the defendant was guilty;

e. that the defendant would have the right to be represented by a lawyer at this trial and at any appeal following the trial;

f. that through its lawyer the defendant would have the right to confront and cross-examine the witnesses against it;

g. that the defendant could subpoena witnesses, including corporate representatives, to testify in its defense if decided to; and

h. that the defendant would not have to present any defense if it did not want to and that if it did not present any evidence, the jury could not hold that against the defendant.

4. I understand that if the defendant pleads guilty, there will be no trial and the defendant would be giving up all of the rights listed above.

5. I understand that if the defendant decides to enter a plea of guilty, the judge will ask me questions under oath and that if I lie in answering those questions, I could be prosecuted for the crime of perjury, that is, for lying under oath.

6. I understand that if I plead guilty on behalf of the defendant, it will have given up its right to appeal, except as set forth in the appellate waiver provisions of my plea agreement.

7. Understanding that the defendant has all these rights and that by entering a plea on behalf of the defendant, the defendant is giving them up, the defendant still wishes to plead guilty.

8. Except as detailed in the plea agreement, I acknowledge that no one has promised me or the defendant what sentence the Court will impose. I am aware and have discussed with my attorney that, at sentencing, the Court will calculate the Sentencing Guidelines range, and then, in determining the defendant's sentence, will consider the Guideline range and all relevant policy statements in the Sentencing Guidelines, along with other sentencing factors set forth in 18 U.S.C. § 3553(a), including

(1) the nature and circumstances of the offense and my personal history and characteristics;

(2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(5) the need to provide restitution to any victims of the offense.

MSC SHIPMANAGEMENT LIMITED
Principal Corporate Officer of Defendant

TANNER HONEA
Counsel for Defendant MSC Shipmanagement Limited

Dated: August 26, 2026

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 26-403** |
| | : | |
| **MSC SHIPMANAGEMENT LIMITED** | : | |

**ATTACHMENT 1 TO GUILTY PLEA AGREEMENT**
**Environmental Compliance Plan**

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PLAN ("ECP") have been prepared pursuant to the Plea Agreement between MSC Shipmanagement Limited("MSC") and the United States[1] (hereinafter "Government") filed in the United States District Court for the Eastern District of Pennsylvania. Compliance with all the standards and requirements of the ECP is an essential term of the Plea Agreement and a special condition of probation.

The ECP includes various provisions to ensure that all Covered Vessels technically managed by MSC comply with all applicable maritime environmental requirements established under applicable international, flag state and port state law, including, but not limited to the International Convention for the Safety of Life at Sea ("SOLAS"), the International Safety Management ("ISM") Code, the International Convention for Prevention of Pollution from Ships ("MARPOL"), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act ("PWSA"), the Act to Prevent Pollution from Ships ("APPS"), the Clean Water Act ("CWA"), and the Oil Pollution Act of 1990 ("OPA 90"), and with the requirements of this agreement itself. The auditing requirements of this ECP apply to all Covered Vessels identified below that are technically managed by MSC and call at U.S. ports.

Covered Vessels identified in the ECP that cease operations within U.S. jurisdiction, whether due to a new Charter Party or a decision by Charterers to relocate such Covered Vessel(s), shall be exempted from audit requirements, provided that MSC gives prior written

[1] The term "United States" includes the U.S. Attorney's Office for the Eastern District of Pennsylvania and the Environmental Crimes Section of the United States Department of Justice. The United States, together with the U.S. Probation Office for the Eastern District of Pennsylvania and the U.S. Coast Guard Office of Casualty Investigations & Analysis, are collectively referred to as the "Interested Parties."

notification to the Department of Justice ("DoJ") and the Third-Party Auditor ("TPA").

The "Covered Vessels" are ships under MSC management sharing the same or similar designs, size, types of engineering equipment and crew complement as the MSC Samira III, which, as of the date of signing of this ECP, are:

| Vessel Name | IMO # |
|---|---|
| MSC EXPRESS III | 9374571 |
| MSC JULIANA III | 9275036 |
| MSC SAGITTA III | 9401166 |
| MSC RESILIENT III | 9240873 |
| MSC LUCIA III | 9286774 |
| MSC HANISHA III | 9283708 |
| MSC SARYA III | 9241451 |
| MSC EMDEN III | 9326823 |

Any Covered Vessel that changes management pursuant to a bona fide arms-length transaction shall be excluded as a Covered Vessel. MSC further agrees to abide by the provisions more specifically set forth in Section N, infra, Changes to Management.

## A. APPLICABILITY/PURPOSE

The ECP is not intended to replace the ISM Code or any other applicable international legal requirement or United States statute or regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of the Covered Vessels; to better manage, detect and prevent environmental violations to ensure that (1) MSC is following the requirements of this ECP; (2) MSC's Covered Vessels comply with all applicable maritime environmental requirements established under international, flag state, and port state law and all applicable Federal and state statutes and regulations; and (3) MSC implements an effective environmental management system to prevent recurrence of violations.

## B. COMPLIANCE MANAGER

(1) Within sixty (60) days of entry of the Plea Agreement, MSC shall designate a Compliance Manager ("CM") for the purposes of this ECP, who shall report directly to the Managing Director ("MD") of MSC. MSC shall provide the name of the CM to the United States. The CM may be the same individual as MSC's "designated person" under the ISM Code, unless reasons are provided to the Government justifying why the "designated person" should not also be the CM. The CM shall be responsible for coordinating with the TPA, as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of MSC managed vessels, ensuring that reviews, audits and surveys are carried out as required, and ensuring that all documents are properly maintained and that

reports are made on a timely basis to the Government. All reports required under this ECP shall be reviewed by the CM and signed.

(2) MSC shall establish a procedure and reporting system that requires and enables all officers, crew members, employees, and shore-side personnel involved in the management of MSC's Covered Vessels to notify the CM of all violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the TPA and the Government in carrying out the reviewing, auditing, and oversight functions required by applicable law and this ECP. MSC agrees not to retaliate against any officer, crew member, employee, or shore-side personnel involved in the management of MSC seagoing vessels making any such report.

(3) The CM shall be authorized to access all records and personnel regarding all Covered Vessels for the purpose of ensuring compliance with the ECP. The CM shall be authorized to implement all requirements of the ECP on all Covered Vessels. The CM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the U.S. Probation Office, the designated representative of the Coast Guard, and MSC. The CM position will be filled by an individual(s) with significant maritime vessel operational background who possesses auditing experience. The CM must be thoroughly familiar with the requirements of this ECP and is knowledgeable about domestic and international maritime environmental laws and regulations.

**CM Responsibilities:**

(a) Auditing and Compliance Assessment

Verify that the TPA conducts the review and audits required by the ECP and that the required reports are prepared.

(b) Covered Vessel Reviews

Supervise annual overall reviews of the environmental compliance program and focused reviews of key environmental areas (such as Bilge Water Management, Sludge Management, Sewage Management, Garbage Management, Ballast Water Management and Air Pollution Management) to promote the adoption of "best practices."

(c) Reporting of Non-Compliance by Employees and Crew Members

Use the current "Speak Up" procedures applicable to MSC to reinforce a means by which employees and crew members may report (anonymously, if desired) issues of non-compliance with this ECP. The CM shall review, investigate, and document in a timely fashion reports of non-compliance received and shall initiate, monitor, and document all actions taken in response to such reports. The CM shall maintain records of such reports and actions taken and shall

make them available for review by the TPA.

## C. MASTER AND CHIEF ENGINEER

(1) The Master of each Covered Vessel subject shall ensure that prompt reports are made to the CM of any non-compliant condition associated with environmental protection of any Covered Vessel.

(2) The Chief Engineer on board each Covered Vessel subject to this ECP shall perform the following duties subject to this ECP:

a) Daily measure, monitor, record, and manage shipboard wastes generated by engineering operations;

b) Report to the CM and cooperate with MSC to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment, and document all efforts to do so in a log that is available for review and audit.

## D. THIRD PARTY AUDITOR ("TPA")

(1) During the probationary period, a TPA shall conduct the audits and submit the reports described in this ECP. Within sixty (60) days of sentencing, MSC shall submit to the Government a list of three (3) qualified candidates for the TPA position along with its recommendation for approval of one of the candidates, from which the Government will select a candidate to serve as the TPA. In the event that none of the candidates is found acceptable, or if the work of the TPA is unsatisfactory at any time, the Government may request that MSC supply additional candidates. The Government reserves the right to reject any proposed TPA. All work performed by the TPA and any auditor acting under the authority of the TPA must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. §1001.

(2) Qualifications. Qualified candidates for the TPA include individuals or firms that have staff capable of applying the most current International Standards Organization ("ISO") 14000 environmental management auditing criteria and have the following experience, expertise, and capabilities:

a) expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements;

b) experience in performing environmental audits in industrial or maritime environments; and

c) sufficient expertise and competence to assess whether MSC has adequate policies, procedures, and equipment in place to ensure compliance with this ECP and to

ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.

(3) Adequacy of Staff. The TPA must have adequate staff to perform the work required of this ECP. Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits. The knowledge, skills, and abilities of the TPA and staff must align with the criteria of the audits. Extensive experience with the operation, maintenance, and repair of shipboard and machinery space systems, equipment, and components is a prerequisite. The TPA shall employ at least one senior level Marine Engineer (Chief, First or Second Engineer) or with equivalent inspection & audit experience or ex-Class or USCG Officers with audit track records to perform shipboard machinery space audits. The TPA shall provide the Government with the resumes of the TPA's auditors assigned to conduct shore-side and vessel audits.

(4) Contractual Independence. During the term of probation, the TPA shall not directly own any stock in MSC; must have no other ongoing contractual or business relationship, other than that of the TPA, with MSC; and may not seek or serve in other capacities with MSC, unless first disclosed to the Government and the Court, and unless expressly approved by the Government. The TPA must exercise independent judgment and ensure that the objectives set forth in this ECP are met. MSC and the TPA shall notify the Government if any contractual relationships or proposed contractual relationships between MSC and the TPA arise during the term of probation.

(5) Functional Independence. The TPA shall function independently of MSC but may communicate with MSC about the substance of its work. At its discretion, the TPA may share with MSC its audit checklist. The TPA may consult with but shall not receive or request approval of any form from any employee or crew member of MSC Covered Vessels regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this ECP.

## E. ENVIRONMENTAL MANAGEMENT SYSTEM

(1) The CM shall be responsible for establishing an Environmental Management System (EMS). To the extent possible, the EMS shall be based upon the ISO 14001/2015 standards and shall be part of MSC's documented management system for the Covered Vessels. To the extent MSC has already developed an EMS, the TPA shall audit the Covered Vessels for compliance with MSC's EMS and the additional requirements pursuant to this ECP.

## F. THE AUDITS/AUDITING PROCESS

(1) Audit Phases

This ECP requires four (4) phases of audits and inspections to be conducted:

(a) Initial Audits - TPA

(b) Ongoing Audits - TPA
(c) Final Audits - TPA
(d) Internal Audit Monitoring - MSC

(2) Timing and Numbers of Audits

The timing and numbers of audits shall be as follows:

a) The Initial Audits shall commence on the date of sentencing and conclude by the end of the first year of probation. The Initial Audits shall include 100% of the Covered Vessels.

b) The Ongoing Audits shall take place during the second year of probation. The Ongoing Audits shall be conducted on 50% of the Covered Vessels.

c) The Final Audits shall be conducted during the third year of probation. The Final Audits shall be conducted on the remaining 50% of the Covered Vessels not audited during the Ongoing Audits listed in the ECP.

d) Should Defendant assume technical management of a Covered Vessel during a period of the probation in which it would make the conducting of two audits impracticable or unduly burdensome (i.e., ships do not trade in the United States), it shall so communicate that to the Government. The Government will exercise good-faith reasonable judgment to accommodate Defendant's request.

e) The TPA is not required or expected to audit any physical office location of MSC. If the TPA determines that an office audit is necessary, it shall communicate the reasons for such and audit to the CM and the Government. The Government and the CM shall consult on the request and will be reasonable in their assessment of whether the office audit is needed.

(3) During the first year of probation, the TPA shall conduct a round of audits of all Covered Vessels while the vessels are underway, to the maximum extent practicable (the "Initial Audits"). These audits should take place on voyages of short duration (1-3 days) to the maximum extent practicable. MSC and the TPA shall coordinate the audits to accommodate, as much as practicable, the vessels' management and schedule. The audits shall be performed to ascertain and evaluate various aspects of MSC Covered Vessels: their systems, equipment and components; current practices, whether documented or not; and the knowledge, skills, and abilities of ship and shoreside personnel as they relate to the requirements of this ECP, and other applicable maritime environmental protection requirements. During the second year of probation, the TPA shall conduct a second set of audits of fifty percent (50%) of the Covered Vessels (the "Ongoing Audits"). These audits should take place on voyages of short duration (e.g., 1-3 days) to the maximum extent practical.-During the third year of probation, the TPA shall conduct a second set of audits of fifty percent (50%) of the Covered Vessels (the "Final Audits"). These audits should take place on voyages of short duration (e.g., 1-3 days) to the

maximum extent practical and shall be carried out as per paragraph H ("FINAL EMS/ECP COMPLIANCE AUDIT") below.

(4) The audits performed pursuant to this ECP shall exceed a typical SMS audit in scope and will be used to determine practices, procedures, and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state. The results of the audits will be used to shape and revise the EMS.

(5) Each audit shall meet the following specific requirements:

a) It shall assess all waste streams developed from any system, equipment, or component found in each machinery space on board Covered Vessels. This will include observation and documentation describing the status and quantity of leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

i. all pump and valve seals and glands during operation;
ii. all piping systems, flanges, gaskets, fittings and joints;
iii. all equipment casings such as main and auxiliary engines, and reduction gears;
iv. operation of engines, boilers, incinerators, and evaporators; and
v. all other mechanical components found aboard Covered Vessels.

b) It shall assess the adequacy and performance of the Oily Water Separator (OWS), Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the TPA shall conduct an operational test using the normal tank or bilge well supply as would be used in normal operations. The supply tank or bilge well must not be diluted. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludge, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the CM and other shoreside personnel.

c) It shall assess the crew of each Covered Vessel's ability to handle the operational, maintenance, and repair workloads in maintaining all systems, equipment, and components onboard in order to minimize waste stream development to a level as low as reasonably practical.

d) It shall assess the adequacy of the policy, procedures, current practices, and equipment, including storage capabilities, used to manage shipboard solid wastes generated in all areas of the Covered Vessel and the effectiveness of garbage management plans.

e) It shall assess the adequacy of the policy, procedures, current practices, and equipment associated with cargo management developed during all evolutions of cargo operations.

f) It shall assess the ability of each Covered Vessel's crew members to create, devise, or implement an unauthorized process to dispose of shipboard waste, including regular garbage, dunnage, machinery space bilge water, and sludge.

g) It shall assess the adequacy of each Covered Vessel's responsible crew members to maintain the following records and shall include a complete comparative analysis (against each other where possible) of the following records:

i. Oil Record Book;
ii. Engine Room alarms;
iii. Tank sounding logs (if a Covered Vessel does not maintain such a log, it must start);
iv. Personnel work records and lists related to pollution prevention equipment;
v. Maintenance records related to pollution prevention equipment;
vi. Vendor service records related to pollution prevention equipment;
vii. Bilge waste and sludge receipts;
viii. Deck Log;
ix. Garbage Record Book;
x. Oil to Sea Equipment Interface Logs;
xi. Hazardous waste manifests;
xii. Solid waste discharge receipts;
xiii. Oil Content Monitor (OCM), OWS, and calibration logs or annual surveys by the makers;
xiv. Training records related to pollution prevention;
xv. Inspection documents; and
xvi. SMS or SQE Audit documents

h) It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

i. Solvents;
ii. Degreasers;
iii. Cleaning wastes;
iv. Batteries;
v. Paints;
vi. Oily rags;
vii. Fluorescent and incandescent bulbs;
viii. Expired boiler and engine chemicals;
ix. Used boiler and engine chemicals;

x. Galley greases;
xi. Pyrotechnics;
xii. Medical supplies;
xiii. Contaminate fuels;
xiv. Used oil and greases;
xv. Incinerator ash;
xvi. Transformer oils; and
xvii. Contaminated refrigerants

i) It shall assess and evaluate documentation containing the certifications that each Covered Vessel's officers understand the requirements of this ECP and shall require signed statements by a Covered Vessel's Engine Room officers attesting that they understand false entries in the Oil Record Book for machinery space and deck/cargo space operations are a violation of law.

j) It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capabilities to communicate with shore-side personnel, including the CM and designated persons, and shall review such communications. All such communications should take place in the English language, or, if necessary, be translated to English.

k) It shall assess the frequency and adequacy of shipboard pollution prevention and environmental protection meetings and training. This assessment shall be made through interviews with crew members.

l) It shall assess the policy, procedures, and current practices used on Covered Vessels and ashore to track crew member environmental training, as well as the availability of and access to training resources.

m) It shall assess the adequacy of existing methods for employees and crew members to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crew members and shoreside personnel.

n) It shall assess the policy, procedures, and current practices to ensure that Covered Vessels' vendors, technicians, and other non-crew members who are boarding and/or sailing with the Covered Vessels follow MSC's requirements regarding pollution prevention and environmental protection.

o) It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including storing seals and preventing the use of duplicate seals.

p) It shall assess the policy, procedures, current practices, and equipment used to maintain refrigeration units, including availability and status of

refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

q) It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including conditions of hoses, connections and transfer equipment, and shall include reviews of Declarations of Inspections as applicable.

r) It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of Covered Vessels, including a review of the shipboard oil pollution emergency plans and evaluation of personnel performing such duties.

s) It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

t) It shall survey all engineers serving onboard Covered Vessels at all levels for information on how to make the OWS, OCM, associated systems, and waste management processes tamperproof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey shall request the opinions of the Covered Vessels' engineers on their ability to adequately maintain the Covered Vessel's systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant circumstances. The responses will be maintained in original format and made available to the CM and TPA. The original survey responses shall be included in the Report of Findings.

(6) At the conclusion of the first year of audits, the TPA shall prepare a Report of Findings. If the TPA believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, MSC may request that the Government grant the TPA such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to the CM and the Government. Based on the Report of Findings, MSC shall develop or update the EMS as described below.

## G. ENVIRONMENTAL MANAGEMENT SYSTEM MANUAL

(1) Within nine (9) months of receiving the Report of Findings for the first round of audits from the TPA, MSC shall update, if so necessary, the procedures contained in the EMS. If MSC believes that additional time is needed to analyze available information or to gather additional information to update the EMS, MSC may request that the Government grant it such additional time as needed to prepare and submit the EMS, which request shall not be unreasonably denied. If necessary, the Government

may grant additional time in thirty (30) day increments for updating the EMS.

(2) MSC shall submit an updated EMS to the TPA and the Government immediately upon its completion. The TPA and the Government shall provide comments on the updated EMS within ninety (90) days of receipt unless additional time for review is requested in writing. MSC shall submit a supplement to the EMS or a written response, as appropriate, within ninety (90) days of receipt of the comments.

## H. FINAL EMS/ECP COMPLIANCE AUDIT

(1) Beginning twenty-four (24) months after the date of sentencing, MSC shall arrange for, fund and-complete a Final EMS/ECP Compliance Audit of fifty percent (50%) of MSC's Covered Vessels that were not audited during the second year of probation. These audits should take place on voyages of short duration (e.g. 1-3 days) to the maximum extent practical. The audits are to be conducted to verify compliance with applicable environmental laws and regulations and the requirements of the EMS and ECP. During this final audit phase MSC shall immediately advise the Government of any issue that comes to its attention that adversely impacts MSC's compliance with all applicable laws and regulations and the EMS/ECP.

(2) The Final EMS/ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 19011 as supplemental guidance, and shall assess conformance with all requirements of the EMS and with the additional requirements of this plan. Designated Government representatives may participate in the audits as observers at Government expense. MSC shall make timely notification to the Government regarding audit scheduling to make arrangements for observers to be present.

(3) The TPA shall deliver audit reports for each Covered Vessel and facility to the CM upon completion. In addition, the TPA will deliver an Audit Report to the Government within thirty (30) days after the completion of each audit. If the TPA believes that additional time is needed to analyze available information or to gather additional information, the TPA may request that the Government grant the TPA such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report.

(4) The Final EMS/ECP Compliance Audit Reports shall present the Audit Findings and shall, at a minimum, contain the following information:

a) Audit scope, including the time period covered by the audit;

b) The date(s) the on-site portion of the audit was conducted;

c) Identification of the audit team members;

d) Identification of the company representatives and regulatory personnel (if any) observing the audit;

e) The distribution list for the Final EMS/ECP Compliance Audit Report;

f) A summary of the audit process, including any obstacles encountered;

g) Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

h) Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

i) Certification by the TPA that the Final EMS/ECP Compliance Audit was conducted in accordance with this document and general audit principles.

(5) Within ninety (90) days from completion of the Final EMS/ECP Compliance Audit of a particular facility or Covered Vessel, MSC shall develop and submit to the Government, for review and comment, an Action Plan for expeditiously bringing Covered Vessel(s) into full compliance with all applicable laws and regulations and the EMS/ECP to the extent not already completed. The Action Plan shall include the result of any root-cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. MSC may request that the Government permit a brief extension of the time limit stated above on a case-by-case basis. Such permission shall not be unreasonably withheld.

(6) The Action Plan shall be reviewed by the United States which shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, MSC shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, MSC shall submit a written Action Plan Completion Confirmation to the Government.

## I. NON-COMPLIANCE

a) This EMS/ECP does not in any way release MSC from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other applicable international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

b) The EMS/ECP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this EMS/ECP may be considered as non-compliance. Within ninety (90) days from the identification of non-compliance, MSC shall develop and submit to the Government, for review and comment, an Action Plan for expeditiously bringing Covered Vessel(s) into full compliance. The Action Plan shall be reviewed by the Government, which shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, MSC shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, MSC shall submit a written Action Plan Completion Confirmation to the Government. Failure of MSC to implement an agreed Action Plan may be a violation of the Plea Agreement and may be grounds for the revocation or modification of MSC's probation. Should the Government seek to revoke or modify MSC's probation based on MSC's refusal to pay valid charges for the TPA and/or its failure to provide the TPA access to the Covered Vessels, facilities, personnel, or documents, and/or as the result of any disagreement regarding any of the provisions of this EMS/ECP, MSC shall have the right to fully contest such revocation before the appropriate U.S. District Court.

## J. BOARD OF DIRECTORS

MSC shall ensure that MSC's MD receives and reviews reports from the CM and any applicable report from the TPA concerning the implementation of this EMS/ECP, including environmental compliance, EMS implementation, and manager, officer, and crew training. This review shall happen at least once per year. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the Government.

## K. TRAINING REQUIREMENTS

(1) The CM will be responsible for developing training programs to educate and train crew on Covered Vessels and shore-side employees associated with MSC's management of its Covered Vessels. MSC will appoint a Fleet Training Officer, who may be the CM, to ensure that the requirements of this section are met.

(2) Training shall be conducted annually for all employees and crew members by qualified instructors. New hires will receive this training as part of the initial Company orientation before assuming their duties. The training will cover relevant sections of this ECP, the EMS, and applicable marine environmental protection requirements. It will also include shipboard-related technical and practical information on pollution prevention, as well as the operation, maintenance, and repair of pollution prevention equipment and systems, tailored to the employees' and crew members' specific responsibilities and departments. Additionally, the training will address the consequences to MSC and its employees and crew members for non-compliance with the ECP, EMS, and marine

environmental regulations. Training shall occur annually for all employees and be performed by qualified instructors before an employee assumes his or her duties. The training must include discussion of the consequences to MSC and its employees for failure to comply with the requirements of this ECP, EMS, and existing marine environmental protection requirements. Training may be physical (in-person), remote, or computer based.

(3) A basic initial training program shall be provided to crew members currently on board Covered Vessels in an effort to promptly mitigate pollution risk and ensure environmental protection. Additionally, crew members must receive shore-side training prior to returning to a Covered Vessel on a new contract.

(4) The training shall include instruction regarding:

a) Corporate environmental compliance structure, including the CM and contact information;

b) Comprehensive overview of this ECP, the EMS, and other marine environmental protection requirements;

c) The system used to report non-compliance;

d) Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability;

e) Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations;

f) All requirements set forth in the Engineering section of this ECP;

g) Position specific training in the operation, maintenance and repair of oily water separators, incinerators, oil content discharge monitoring equipment, and other pollution prevention equipment;

h) Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases; and

i) All other shipboard environmental protection related procedures examined and described in the required initial review.

(5) All new crew members reporting to work on board Covered Vessels shall receive training within fourteen (14) days of beginning to work on board the Covered Vessel. MSC shall maintain documentation aboard each Covered Vessel verifying that all officers and crew members working on the vessel have received the required training. Such documentation shall be made available to the TPA and the Government upon request.

(6) The Chief Engineer and Chief Officer onboard each Covered Vessel listed

shall prepare independent written verification that all engine room and deck crew members have received the training required by this EMS/ECP. All Engine Room crew members shall sign and date a statement acknowledging completion of the training. This written verification, together with the signed acknowledgment, shall be completed semi-annually and maintained in the engine control room of each Covered Vessel.

## L. ENGINEERING REQUIREMENTS

(1) Time of Implementation. Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as is reasonably practicable, but in any event not later than six (6) months from the date of sentencing.

(2) Environmental Control System

a) MSC shall implement an Environmental Control System or ECS to help prevent unauthorized usage of connections within the engine room, machinery spaces, and cargo/deck spaces. Under the ECS, MSC shall require crew members to use numbered seals, locks, or welds (on flanges) to prevent the unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system or and overboard discharge connections. Seals used as part of the ECS shall be non-reusable and uniquely numbered.

b) An ECS Seal Log shall be maintained by the Chief Engineer that records each time a seal is affixed or removed in the engine room and machinery spaces, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal or replacement. The keys used to open locks utilized as a part of the ECS shall be controlled. The ECS Seal Log shall include all MARPOL-standard connections (bilge, sludge, and sewage) located in the Engine Room and shore connections on the main deck.

c) Any existing seals that are found to have deteriorated or had their numbers partially or completely erased shall be replaced immediately, with the reason for replacement entered in the respective ECS Seal Log.

d) The CM will be responsible for ensuring that no duplication of ECS seal numbers occur and will maintain documentation indicating which series of environmental seals have been supplied to each Covered Vessel.

(3) Tank Piping

a) To prevent unauthorized manipulation of waste management systems within the engine room and machinery spaces, each Covered Vessel shall maintain Classification Society-approved drawings that reflect all approved modifications made to waste management systems.

b) MSC shall establish and maintain approval procedures for any modifications made to shipboard waste management tanks or their systems. Those procedures shall require prior CM approval for all non-emergency modifications. Any emergency modification must be reported to the TPA promptly after work is performed. Prompt approval or removal of any emergency modifications after the emergency has ended shall be required.

c) Within thirty (30) days of MSC's sentencing, the CM shall ensure that notification is given to all Covered Vessels regarding the prohibition against using unauthorized stub pipes, cross connections, or piping on engine room waste.

d) Personnel working on Covered Vessels shall promptly notify the CM of the existence and purpose of any unauthorized stub pipes, cross connections, or piping on engine room waste tanks in a Covered Vessel. Within fourteen (14) days of receiving such information, the CM shall ensure that it is relayed to the Interested Parties, along with any findings and corrective actions.

e) Classification Society-approved drawing(s) representing the current physical layout of the systems shall be available on board. The Chief Engineer shall maintain documentation explaining the reason(s) for any changes/modifications made after the date of sentencing for engine room/machinery space systems. Copies of this documentation and drawing(s) shall be maintained aboard the Covered Vessel and provided to the TPA upon request.

f) To prevent unauthorized usage of bilge water tanks or oily waste tanks, MSC shall require that ECS seals or locks be placed on all tank hatches, valves, or flanges that could allow for an external connection to the system. The ECS Seal Log or Lock Log shall track any time a processed bilge water tank or oily waste tank is opened.

(4) Bilge-Main Cross Connections

a) within sixty (60) days of sentencing, the CM shall ensure that notification is provided to all Covered Vessels regarding the prohibition against the non-emergency usage of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The notification shall state that such usage is similar to bypassing the OWS equipment and is strictly prohibited, except in the case of an emergency. Any method to discharge overboard via the soot collection tank and soot eductor must be disabled and locked out.

b) The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three-inch

letters shall be permanently fixed nearby, stating: "Bilge System Piping Crossover – Emergency Use Only."

c) To prevent unauthorized usage of those valves, MSC shall require that ECS seals be placed on such valves. The ECS Seal Log shall track any time a crossover to the bilge main is opened. If a valve is remotely operated from the engine control room, the associated push button or switch must be unable to be used without breaking an environmental seal.

(5) Emergency Bilge Suctions

All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the Covered Vessel's engine room bilges, like those which may be connected to sea water circulating pumps, shall be painted international orange on all Covered Vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance.

(6) Blank Flanges

a) To prevent unauthorized connections within the engine room and machinery spaces of Covered Vessels, every blank flange connected to overboard piping, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ECS seals through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ECS seals used shall be numbered and records kept in the ECS Seal Log. Alternative sealing methods, such as numbered foil-coated sticker seals for flanges, may also be used.

b) The blank flange securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS.

(7) Additional OWS / OCM Requirements

a) The sample line from the OWS discharge connection to the sample/flush line control valve will be painted a bright color to distinguish it from other tubing and piping in the area. The line must be routed so it is clearly visible to the extent possible for its entire length. No additional connections or tees of any kind may be added to the line.

b) MSC shall have the OCM manufacturer or contracted distributor perform annual testing that ensures the OCM requires a sample flow for normal operation and control.

c) Every Covered Vessel shall perform monthly operational tests of the OWS and OCM in the presence of the Chief Engineer and one other engineer. The test shall be logged in the Covered Vessel's ORB. The Chief Engineer shall send a report to the assigned superintendent and CM.

d) In addition to the operational test performed in the presence of the TPA, every Covered Vessel shall conduct an annual operational test of the OWS system under actual operational conditions. This test shall include one (1) full hour of continuous processing of the contents of the Bilge Holding Tank without dilution, and without dilution of the sample line leading to the OCM,[2] conducted by the Chief Engineer in the presence of a MSC shore-side representative or Class surveyor, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS. If an actual discharge is not feasible due to the location of the Covered Vessel or the levels of the bilge holding tanks, then the discharges shall be through a recirculation line, in accordance with the procedures approved by the Covered Vessel's Classification Society and provided further that soundings of the bilge holding tanks shall be made before and after the test and shall be made a part of the test record and providing that any alarms shall be recorded and made part of the test record. All of the above shall be recorded in the ORB (Part I). In the event that the assessment determines the OWS is not operating as designed, then an immediate report shall be made to the cognizant superintendent, CM, the Interested Parties (namely DOJ, CG personnel and offices associated with this ECP), and the TPA, with a copy of the Engine Room alarm printout to be retained.

e) Every Covered Vessel shall inspect the OWS source tanks every six (6) months and remove any accumulated oil if necessary. The OWS source tanks shall be cleaned during dry docking or sooner if necessary. Such cleaning shall be logged in the Preventive Maintenance System.

f) Anytime an OCM is subject to maintenance or calibration, such actions shall be logged in the ORB.

(8) Recordkeeping

a) All sounding records required by this section shall be maintained and available to auditors for the duration of the ECP.

b) A portable pump log shall be maintained documenting all instances of onboard use of a pneumatic or portable pump. The log shall include a description of the fluid pumped, its source, and the tank or location where the fluid was transferred. The log shall include the date and time the pump was used and shall identify the person(s) who checked out the pump and operated it.

[2] A test performed where the source tank is diluted with water or does not contain bilge water is strictly prohibited.

(9) Oil Record Book Entries

Entries made into the ORB shall be made and signed by the officer or officers in charge of the operation, reviewed and countersigned by the Chief Engineer (ORB Part I) or Chief Officer (ORB Part II), and each completed page shall be signed by the Master.

(10) Tank Sounding Records

MSC shall provide each Covered Vessel with a standard format hard copy tank sounding log that includes, for each sludge and bilge tank associated with bilge water and/or oil residues (sludge), and the tank name/designation, tank capacity, sounded quantity, and time and method of sounding, as specified in the IOPP Certificate Supplement. Soundings from each tank shall be taken at least daily. The individual taking the tank sounding shall make entries in the sounding log and sign each entry.

(11) Fuel Oil/Lube Oil Purifier Settings and Line Breaks

a) MSC shall have a standard system for monitoring fuel oil and lube oil management, including the operation of the fuel oil and lube oil purifiers, on a monthly basis.. Any incident involving ships receiving proven poor quality fuel shall be noted in the Engine Room Log or similar record once it becomes known, and such entries shall refer to the relevant bunker receipts.

b) Any extraordinary operations (such as increased frequent draining of fuel oil service and settling tanks, draining engine lube oil sump tanks of excessive water) shall be recorded in the official Engine Room Log and explained to the extent possible, and the records made available for inspection.

c) All oil leaks exceeding manufacturer or historical volumes, including any fuel and/or lubricating oil leaks resulting from mechanical failure shall be reported to the CM.

(12) Oil-to-Sea Interfaces

a) MSC shall establish a logbook for each Covered Vessel for monitoring equipment having oil-to-sea interfaces which relies on mechanical tension, hydrostatic pressure on the seal, and the surface tension between water and oil to minimize oil releases to the sea. Such interfaces may include stern tube bearings, stabilizers, controllable pitch propeller systems, maneuvering thrusters, propulsion pods, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the waters surrounding the Covered Vessel. Any replenishment of oil into the head tanks, operating systems reservoirs, or other receivers associated with this equipment shall be

logged, regardless of the quantity involved. Ingress of water or drainage of water into or from these systems must also be logged, as far as practicable.

b) Any extraordinary operations (such as frequent draining of interface operating systems, tanks, and spaces of excessive water) shall be recorded in the official Engine Room Log, explained to the extent possible, and such records shall be made available for inspection.

(13) Fleet Operational Survey

a) Within six (6) months of the date of sentencing, MSC shall issue a survey to all Masters and Chief Engineers on its Covered Vessels for information on how to improve MARPOL compliance, to include what new equipment, maintenance, parts, and procedures would be beneficial. This survey shall include a request for the frank opinions of the Covered Vessels' officers as to their ability to adequately maintain the Covered Vessels' systems, equipment, and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant or unsatisfactory circumstances.

b) The CM shall evaluate the responses and establish a plan to evaluate, test, and implement viable ideas for improvement. The CM shall also address, to the extent practicable, legitimate maintenance concerns suggested by the Covered Vessels' Masters and Officers.

c) A summary of the reported information and corrective actions will be provided to the Interested Parties and the TPA.

## M. DOCUMENTATION AVAILABLE FOR INSPECTION

(1) The CM shall ensure that all documentation required by this EMS/ECP is maintained and available for inspection by the TPA and the Government. The Master of each Covered Vessel under this ECP shall maintain, on board the Covered Vessel: all records required by international conventions and treaties including SOLAS, the ISM Code, and MARPOL; all records required under applicable State and Federal statutes and regulations; and any additional documents required under this EMS/ECP, such as crew training records. The Master will make these records available to the TPA and the Government upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the Government by the TPA.

## N. CHANGES TO MANAGEMENT

(1) The parties recognize that during the term of probation, the number and identity of Covered Vessels managed by MSC may decrease. Any Covered Vessel, the management of which is assumed by MSC and that will call at United States ports shall be subject to the terms and conditions of this EMS/ECP. Any Covered Vessel removed

from management by MSC shall be excluded from the scope of the EMS/ECP. MSC agrees that it will make best efforts to keep at least [four] under management during the term of this ECP. MSC agrees that it will immediately (but in no event later than twenty (20) working days, excluding weekends or holidays, following a change) notify the Government of any change in name, flag of registry, recognized organization, ownership, or class society of any such of Covered Vessels, to include vessels the management of which is assumed by MSC. MSC agrees that this EMS/ECP shall remain in effect for all of the aforesaid Covered Vessels regardless of changes in the Covered Vessels' flag of registry, recognized organizations, name, or class society, so long as the Covered Vessels are managed by MSC and may call at United States ports. MSC shall notify the Government before any Covered Vessel is released from the requirements of the EMS/ECP due to a change in management. MSC shall ensure that any Covered Vessel that it manages during the course of probation is audited in accordance with this ECP.

**O. SELF-ENFORCEMENT**

MSC further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/ECP is diligently complied with.

**P. REVISIONS/MODIFICATIONS**

The requirements of this EMS/ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should MSC be unable to comply with any of the deadlines, MSC shall immediately notify the Government in writing of the reason(s) for non-compliance and propose a revised timetable. The Government shall then determine whether the revised timetable should be accepted.

**Q. REPORTS**

All reports, documents and correspondence required under this EMS/ECP to be sent electronically to the Government shall be sent to the following offices:

(a) U.S. Department of Justice
Environmental Crimes Section
Attn: Lauren Steele
150 M Street, NE, Suite 4.116, Washington, D.C. 20002
Email: Lauren.Steele@usdoj.gov

(b) U.S. Attorney's Office
Eastern District of Pennsylvania
Attn: Angella Middleton
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Email: Angella.Middleton@usdoj.gov

(c) U.S. Coast Guard Commandant (CG-INV-1)
Office of Casualty Investigations & Analysis
Attn: Designated Representative of the Coast Guard
2703 Martin Luther King Jr. Ave, SE, Stop 7501
Washington, D.C. 20593-7501
Email: hqs-smb-cg-inv-ecp@uscg.mil (less than 10GB)

**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS OF MSC SHIPMANAGEMENT LIMITED**

A meeting of the Board of Directors of MSC SHIPMANAGEMENT LIMITED, a company incorporated and operating in accordance with the laws of Cyprus (the "Company") was held on the 24th day of August 2026.

Present at the meeting in person were all the members of the Board of Directors and all of the directors of the Company, namely:

Mario Aponte - Director

Prabhat Jha - Director & CEO

Prabhat Jha, Director & CEO acted as the Chairman of the Meeting.

All the Directors of the Company being present in person, notice of the meeting was and in case is hereby waived.

The Chairman determined that a quorum of the Board of Directors was present, and that, accordingly, the meeting was duly constituted and called the meeting to order.

The Chairman advised the meeting of the negotiations with the U.S. Department of Justice, Environmental Crimes Section, and with the United States Attorney for the Eastern District of Pennsylvania, regarding charges filed against the Company.

**WHEREAS,** the United States of America contends that the Company has violated the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1908(a), and its regulations;

**WHEREAS,** the Company has engaged in plea negotiations with the U.S. Department of Justice, Environmental Crimes Section, and with the United States Attorney for the District of the Eastern District of Pennsylvania, regarding the charges filed against the Company, which have resulted in a Plea Agreement acceptable to the Company and to the United States;

**WHEREAS,** the terms of the Plea Agreement reached between the Company and the United States of America require the Company to plead guilty to two counts of violating the APPS, and the entry of this plea may require the Company to take certain representations and commitments binding the Company;

**WHEREAS,** pursuant to the Plea Agreement, the United States of America will be filing an Information in the Eastern District of Pennsylvania charging the Company with two felony violations of the statutes said above;

**UPON MOTION DULY MADE,** seconded and unanimously carried;

**IT WAS UNANIMOUSLY RESOLVED:**

That the Company, in consideration of its review of the Plea Agreement, which was explained to the Company by counsel, hereby agrees to those terms and conditions and agrees to enter into the written Plea Agreement;

That any Director of the Company and/or J. Tanner Honea and/or George K. Kontakis of K&L Gates LLP, as attorneys for the Company, are hereby authorized to appear in court as representatives of the Company and enter a plea of guilty on behalf of the Company to two counts of violating the APPS, 33 U.S.C. § 1908(a), to sign the Plea Agreement on behalf of the Company, and to sign all documents necessary to carry out the terms of the Plea Agreement.

That the Company acknowledges and waives its right to indictment by a grand jury and agrees to enter into the Plea Agreement;

That the Company, in consideration of its review of the Environmental Compliance Plan ("ECP") as a condition of the Plea Agreement, which was explained to the Company by counsel, hereby agrees to those terms and conditions and agrees to enter into the written ECP;

That any Director of the Company and/or J. Tanner Honea and/or George K. Kontakis of K&L Gates LLP, as attorneys for the Company, are hereby authorized to appear in court as representatives of the Company and to represent the Company's agreement to the ECP, and to sign the ECP on behalf of the Company; and,

Any Director of the Company be and is hereby authorized and empowered to issue certified copies of the present Minutes.

There being no further business for discussion, and all corporate formalities for such authorization having been observed, the Chairman declared the meeting closed.

| | |
|---|---|
| **Prabhat Jha**<br>Chairman | **Mario Aponte**<br>Director |